J-S27016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.K.H.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3740 EDA 2017 |

Appeal from the Decree October 17, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): 51-FN-001239-2015,
CP-51-AP-0000581-2017, CP-51-DP-0001454-2015

\*\*\*\*\*

| | | |
|---|---|---|
| IN THE INTEREST OF: M.V.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3747 EDA 2017 |

Appeal from the Decree October 17, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): 51-FN-001239-2015,
CP-51-AP-0000583-2017, CP-51-DP-0001455-2015

\*\*\*\*\*

| | |
|---|---|
| IN THE INTEREST OF: C.N.H.-C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| | |
| APPEAL OF: C.C., MOTHER | |
| | |
| | |
| | |
| | No. 3751 EDA 2017 |

J-S27016-18

Appeal from the Decree October 17, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  51-FN-001239-2015,
CP-51-AP-0000582-2017, CP-51-DP-0001456-2015

BEFORE:  SHOGAN, J., LAZARUS, J., and DUBOW, J.

MEMORANDUM BY LAZARUS, J.:                      **FILED JUNE 04, 2018**

C.C. (Mother) appeals from the trial court's decrees[1] involuntarily terminating her parental rights to her three minor children, M.K.M.-C. (born 10/10), M.V.C. (born 1/2008), and C.N.H.-C. (born 10/11) (collectively, Children), and changing the goal to adoption.  Because of the lack of evidence regarding what, if any, bond Mother has with Children and the effect that severing such a bond would have on Children, we are constrained to reverse.[2]

Children first became involved with the Department of Human Services (DHS) when it received a report alleging that Mother had delivered a baby boy (baby) in May 2015 and placed the newborn in a duffel bag.  Family members discovered the newborn in Mother's home one day after the birth;[3] police were

_____

[1] On December 13, 2017, the trial court *sua sponte* consolidated these appeals as they involve related parties and issues.  **See** Pa.R.A.P. 513.

[2] Biological Fathers', M.M. and M.H., parental rights were also terminated to Children.  They have not appealed from those decrees.

[3] In her forensic report, Dr. Erica Williams notes that there was no determination able to be made with regard to whether the infant was stillborn. However, aggravating circumstances were found against Mother in the baby's death.  **See** Forensic Report of Erica Williams, Psy.D., 6/3/17, at 4; **see also** **infra** at 3; **infra**  at n.3.

- 2 -

contacted and Mother was hospitalized for mental health treatment at the Hospital of the University of Pennsylvania (HUP). The baby was pronounced dead at HUP on May 29, 2015, the cause of death unknown.[4] Children were temporarily committed to DHS while an investigation into the baby's death was pending. At a shelter care hearing held on June 2, 2015, Children were placed in foster homes and visitation with Mother was suspended pending an investigation into baby's death. Following an adjudicatory hearing in August 2015, Children were placed in kinship care with Maternal Aunt and the court ordered that HUP "[r]elease any and all medical and psychiatric records for Mother . . . and baby." Hearing Order, 8/11/15.

In March 2016, Children were adjudicated dependent and committed to DHS; they were placed in foster care. Mother was granted two-hour supervised visits with Children on a bi-weekly basis every other Tuesday. Mother was referred for a behavioral health services evaluation and a parenting capacity evaluation.[5] Order, 3/29/16. The goal remained reunification.

---

[4] Associate Medical Examiner Bruch Wainer, M.D., Ph.D., issued a report on baby's death that was admitted into evidence in a March 2016 proceeding. The report includes a comment, stating that "[b]ecause of intervening resuscitative procedures, it is not possible to distinguish whether or not this was a stillbirth or a live birth." Medical Examiner, Findings and Opinions, 8/17/15.

[5] In a separate hearing, it was determined that aggravated circumstances existed with regard to Mother and baby's death. *See* 42 Pa.C.S. § 6315(e)(2) ("If the county agency or the child's attorney alleges the existence of

On August 27, 2016, the court held a permanency review hearing; the goal remained reunification despite the fact that the court found that reasonable efforts had been made by DYS to finalize Children's permanency plans. Mother was referred to behavioral health services for a consultation and/or evaluation, to participate in mental health therapy, to complete the second part of a parenting capacity evaluation, and to have a home assessment completed. At a January 2017 permanency hearing, the court ordered Mother to reapply for medical insurance, engage in therapeutic services, and, again, to complete the second half of her parenting capacity evaluation. The court also ordered that Mother's psychiatric evaluation be released to CUA.[6]

On May 24, 2017, DHS filed petitions to terminate Mother's parental rights to Children under sections 2511(a)(1), (2), (5), (8) and (b) of the

_____

aggravated circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist."). Aggravated circumstances exist when "[t]he child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence, or aggravated physical neglect by the parent." 42 Pa.C.S. § 6302.

[6] Community Umbrella Agency, or CUA, is part of an initiative by Philadelphia's Department of Human Services (DHS) called "Improving Outcomes for Children: A Community Partnership Approach to Child Welfare" (IOC), created to strengthen child welfare services in Philadelphia. **See** http://www.wordsworth.org/wordsworth-cua-2 (last visited 5/7/18).

Adoption Act.[7]   At a June 2017 status conference, the court scheduled a contested goal change/termination hearing for October.  On October 17, 2017, the court held a termination hearing at which Dr. Erica Williams, an expert in parenting capacity and child forensics, CUA case manager, Samantha Gatewood, and Mother testified.  Doctor Williams testified that in her February 2017 clinical interview with Mother, which was part of a court-ordered parenting capacity evaluation, Mother reported that "she had received a [head] injury[8] and was hospitalized as a result of that injury and did not have any memory of being pregnant, giving birth, or zipping the baby in a bag." N.T. Termination Hearing, 10/17/17, at 16.  Doctor Williams characterized Mother as having "a complete disregard for [the infant's death] having occurred." *Id.* at 19.  At the time she was seen by Dr. Williams, Mother was involved in individual therapy; however, the notes from that therapy indicated that Mother was not addressing the reason Children were placed into DHS's care or baby's death.  *Id.*  Doctor Williams opined that without even being open to the possibility of addressing these issues, Mother could not develop an understanding and plan to prevent the behavior from recurring.  *Id.* at 20. As of the date she completed her parenting capacity evaluation report, Dr.

---

[7] 23 Pa.C.S. §§ 2101-2910.

[8]  Specifically, Mother claimed that she slipped while taking a bath, hit her head and was taken to the hospital immediately before the birth of baby in May 2015.

Williams testified that she believed Mother was not yet addressing the death of her baby in therapy. *Id.* at 22.

Doctor Williams did identify Mother's substantial employment where she worked two full-time jobs and her obtaining and maintaining housing as parenting strengths. *Id.* at 23. Overall, Dr. Williams opined that Mother was not capable of providing safety or permanency to Children. *Id.* at 24. However, in her final recommendation in the report, Dr. Williams noted that if Mother were able to demonstrate at least six months of consistent attendance in treatment and address the reasons why Children came into care, that the parties should consider increasing her visitation. Forensic Report of Erica Williams, Psy.D., 6/3/17, at 9.

At the termination hearing Mother testified that she was unaware she was pregnant with baby as she continued to get her menstrual cycle and that she did not know that she was supposed to discuss the circumstances during therapy surrounding baby's death and why Children were in placement. *Id.* at 61-67.[9]

Ultimately, the trial court found that termination was proper where "[M]other has been unable, unwilling, and will not be able to address the issues that brought the children into care [and] that there would be no

---

[9] At the time of the termination hearing, the CUA case manager testified she still would not recommend unsupervised visits among Mother and Children "due to the current concern of [M]other [not ]being able to redirect [Children]." N.T. Termination Hearing, 10/17/17, at 40.

irreparable harm if the parental relationship was terminated and it would be in the best interest of these children to be adopted by their current caregivers." *Id.* at 71.

Mother filed a timely notice of appeal and Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, Mother presents the following issues for our review:

(1)     Whether the trial court erred when it found that [DHS] by clear and convincing evidence had met its burden to terminate [Mother's] parental rights pursuant to 23 Pa.C.S.A. §[§] 2511(a)(1), (a)(2), (a)(5), and (a)(8)[,] and change the goal to adoption after evaluating [M]other's successful completion of her recommended reunification goals[].

(2)     Whether the trial court erred when it found that the termination of Mother's parental rights was in the Child's best interests, would not cause irreparable harm to the children, and that [DHS] had met its burden pursuant to 23 Pa.C.S.A. § 2511(b)].

Mother's Brief, at 2.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). Moreover, we review a trial court's decision to involuntarily

terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

Mother's inability to address the death of her infant and the responsibility she played in that tragic situation justifies termination under section 2511(a)(2).[10] The trial court credited the testimony of Dr. Williams and CUA caseworker Gatewood, who testified that Mother has never admitted that she was aware of her latest pregnancy that ended in the death of her baby. In fact, it was not until the termination hearing that Mother stated that she would begin to discuss the circumstances of Children having been placed in foster care for the past 28 months; in fact, Mother only realized the need to do this two months before the hearing. *See In re Adoption of S.P.*, 47 A. 3d 817, 826 (Pa. 2012) (appellate courts shall "accept the findings of fact and credibility determinations of the trial court [when reviewing termination parental rights cases] if they are supported by the record.").

Under such circumstances, we conclude that terminating Mother's parental rights was appropriate where she demonstrated a "repeated and continued incapacity, abuse, neglect or refusal" to acknowledge the circumstances surrounding baby's death and failed to "take[] steps to remedy

---

[10] We can affirm the trial court's decision regarding the termination of parental rights with regard to any singular subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

the situation." *See* 23 Pa.C.S. § 2511(a)(2). By continuing to deny her pregnancy and the circumstances underlying baby being zipped in a duffle bag, Mother has not demonstrated that she can provide the safety and permanency needed for Children; tragically she has caused them to be "without essential parental care, control or subsistence necessary for [their] physical or mental well-being." *Id.* Moreover, this denial over the 28-month period that Children have been in placement indicates that she "cannot or will not . . . remed[y]" the situation. *Id.* *See In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (termination under section 2511(a)(2) is not limited to affirmative misconduct, but may also include acts of refusal as well as incapacity to perform parental duties).

Having concluded that the court properly terminated Mother's parental rights under section 2511(a), we must now consider whether "the child's needs and welfare will be met by termination pursuant to [s]ection 2511(b)." *In re C.P.*, [] 901 A.2d 516 (Pa. Super. 2006).

> Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond.

> *Id.* at 520 (internal citation omitted). The court should also consider the importance of continuity of relationships to the child, because severing close parental ties is usually extremely painful. *In re Adoption of K.J.*, *supra* at 1134. . . . The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. *In re C.S.*, *supra*. Most importantly, adequate consideration must be given to the needs

and welfare of the child. ***In re J.D.W.M.***, [] 810 A.2d 688, 690 (Pa. Super. 2002).

***In re K.Z.S.***, 946 A.2d 753, 760 (Pa. Super. 2008).

Although section 2511(b) does not expressly require a definitive commentary, the case law calls for interpretation of any parent-child bond. ***In re E.M.***, 620 A.2d 481 (Pa. 1993), and its progeny have shaped the traditional subsection (b) analysis. Thus, if there is any evidence of a bond between the child and the parent whose parental rights are at risk, the wise approach is to conduct a bonding evaluation and make it part of the certified record. ***In re K.Z.S.***, *supra*.

In ***In re P.A.B.***, 570 A.2d 522, 525-26 (Pa. 1990), our Supreme Court noted that, in considering what situation would best serve the needs and welfare of a child, a court "must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial."

> There are some instances, however, where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child. ***See In re K.C.F***., [] 928 A.2d 1046 (Pa. Super. 2007) [] (reviewing appeal after remand for subsection (b) analysis; case involved three children, ages 11, 9, and 8; Mother was drug and alcohol dependent, previously convicted for endangering welfare of children, sentenced to probation, and subsequently incarcerated; this Court held (1) expert witness was sufficiently qualified to evaluate and testify regarding bond between Mother and each child and whether termination was in children's best interests; (2) expert's evaluation characterized children's bond with Mother as compromised, ambivalent, insecure, and unsafe; expert said actual observation of interaction with parent was not pertinent to children over ages of six or seven, because older children have sufficient verbal capacity for interviews; termination of Mother's

parental rights was in best interests of children; (3) termination statute does not require children to be placed in pre-adoptive home as precondition to termination of parental rights; and (4) affirming Orphans' court's order terminating Mother's parental rights**)**.  **In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists.** The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case. ***See In re E.M.***, ***supra*** (involving Mother who suffered from mental retardation and whose two children were similarly afflicted; Supreme Court held there was sufficient evidence to terminate Mother's parental rights under subsection (a), as programs designed to improve Mother's parental skills had failed, despite six years of intervention; but evidence of considerable bond between Mother and children foreclosed termination under subsection (b), absent consideration of that bond and what severing that bond would do to children, particularly where CYS' own expert witness said that bond had not been adequately studied; Supreme Court reasoned:  "To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, in a case such as this where a bond, to some extent at least, obviously exists and where the expert for the party seeking termination indicates that the factor has not been adequately studied, is not proper. Whether the bond exists to such a considerable extent that severing the natural parent-child relationship would be contrary to the needs and welfare of the children is an issue that must be more fully explored by the evidence.").

***In re K.Z.S.***, ***supra*** at 762-63 (emphasis added).

While there was evidence that Children have bonded with their foster parents/families, there is absolutely no testimony regarding the bond between Mother and Children and how the effect of terminating that maternal bond would affect Children.  Interestingly, one of the children, C.N.H.-C. indicated that he would like to visit his mother on weekends.  N.T. Termination Hearing, 10/17/17, at 46.  Thus, the evidence with regard to at least one of the Children presupposes an existing bond with Mother.  Therefore, despite Appellee's

assertion that "it is not difficult to understand that the [t]rial [c]ourt was able to infer that no bond existed between [Mother] and [C]hildren," we disagree.

CUA worker Gatewood testified that each of the children would not suffer irreparable harm were Mother's parental rights terminated. Gatewood came to this conclusion based on her belief that Children had bonded with their respective foster parents, were having their basic physical and emotional needs met, were relatively well-adjusted and were safe in their foster homes. *See* N.T. Termination Hearing, 10/17/17, at 43-49. However, Gatewood had never personally observed any visits between Mother and Children. Moreover, while Gatewood mentioned visitation logs that recount "the events and observations by the visitation coach recorded at or near the time the visitation [between Mother and Children] takes place," the content of these logs was not recounted, nor were not admitted as exhibits for the court to consider in coming to its decision regarding termination. *Id.* at 51-52.

Rather, the trial court relies upon Gatewood's testimony regarding the bond between foster parents and Children when it concludes that termination is proper under section 2511(b) because "there would be no irreparable harm if the parental relationship was terminated." *Id.* at 71. Despite this testimony, however, the court still fails to conduct a proper section 2511(b) analysis of what effect termination would have on the Children *based on the presence of a bond between Mother and Children, not Foster Mother and Children*. Children were 7, 4½ and 3½ years of age when they were removed from Mother. Children have been visiting with Mother since 2016; Mother has

- 12 -

been consistent with her attendance at scheduled visitation. *Id.* at 23. Two of the Children have expressed that they would like to visit or live with Mother. *Id.* at 46-58. Based on this testimony, there clearly is some form of bond between Mother and Children. Thus, an evaluation of this bond is necessary before termination is ordered. The court, after such evaluation is still free to conclude that despite a bond, Children will be better off if Mother's parental rights are terminated and they are adopted into a stable home. It is just premature to make that assumption at this point.

While the fact that some form of bond exists between Mother and Children will not *per se* prevent a court from termination Mother's rights, it is at least a factor that should have been explored below. Moreover, Appellee's assertion that Mother's failure to testify "that she loved the children, wanted them returned to her, . . . that she had any concerns about them[, and that she] never even mentioned any of the[m] by name," inappropriately shifts the burden of proof to Mother. *See* Appellee's Brief, at 30. We remind Appellee that the burden of proof is upon *CYS* as the party seeking termination of Mother's rights to show by clear and convincing evidence that termination meets the needs and welfare of Children under section 2511(b). *In re E.M.*,

620 A.2d at 482. Thus, we are constrained to reverse[11] the trial court's termination decrees.[12]

Decrees reversed.[13] Jurisdiction relinquished.[14]

---

[11] We advise the trial court that in the likely event CYS files another termination petition with regard to Mother, that, pursuant to 23 Pa.C.S. § 2313(a) of the Adoption Act, "[t]he court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents." In *In L.B.M.*, 161 A.3d 172 (Pa. 2017), a majority of our Supreme Court concluded that counsel may serve in both capacities so long as there is not conflict between a child's legal and best interests. However, if the court determines that the Children's legal and best interests conflict, then separate counsel shall be appointed.

[12] We decline to dismiss Mother's appeal due to her alleged failure to comply with Pa.R.A.P. 2117(a)(4), 2119(c), (d), and (e). *See* Appellee's Brief, at 16-19. Mother's minor briefing transgressions do not prevent us from a proper and complete review of the case on appeal.

[13] Although this Court has held that a trial court is not required by statute or precedent to order that a formal bonding evaluation be performed by an expert, *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008), and in fact, in some instances direct observation of the interaction between the parent and child is not necessary and may even be detrimental to the child, *In re K.Z.S.*, *supra*, in the instant termination proceeding there was not even a mention of whether a bond existed between Mother and Children. *Id.* Finally, the trial court did not consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the children, other than in the context of the strength of the bond between foster parents and Children. *Id.*; *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010).

[14] We decline to reverse and remand this case for a hearing on bonding evidence for purposes of a section 2511(b) analysis. It is well-established that this Court applies *a two-part test* for termination of parental rights. *In In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Thus, the party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is proper under *both* subsections 2511(a) and (b). Failure to prove either subsection necessitates reversal of a termination order on appeal and not a second bite at the appeal on remand.

DUBOW, J., Did not participate in the consideration or decision of this memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/4/18